The next case for argument is 193511 Eastern Missouri, Verto Medical Solutions, et al. v. Allied World Specialty Insurance Company. We'll hear from Mr. Cole. Hello, Your Honor. I'm Maury Cole on behalf of Appellants Seth Bregette and Verto. I would like to reserve five minutes for rebuttal. If it pleases the Court. Your Honors, all of the Missouri law on interpretation of insurance contracts is very well settled. And for all the briefing that has taken place in this case, the case really is pretty simple. There is a clear ambiguity between endorsements 11 and 13 in the policy of insurance issued by Allied. This is a words mean things case. The words mean exactly what they say. When we read them, they leave an ambiguity. And when there is an ambiguity, it is clear under Missouri law that it must be resolved in favor of coverage. Endorsement number 11. Let me interrupt you, Mr. Cole. Yes, sir. You're well aware there are all kinds of court appeals cases and all kinds of Supreme Court cases on insurance contracts. Yes. What do you think is the closest one to these facts of a policy issued with two endorsements all at the same minute, I think, taking effect? What's the closest case? Your Honor, it's difficult to say what the closest case is, and you're exactly right. These are both endorsements that are issued at 12.01 a.m. on January the 13th, 2016. And which one is closest? Hard to say. What I can say with certainty, though, is that there is a plethora of cases dating back into the early 1900s, if not before, where they state where one provision of an insurance contract permits coverage and another could be read to prohibit it. They at best create an ambiguity that under settled law must be resolved in favor of coverage. That's the Missouri Supreme Court's case of Ritchie v. Allied Property and Casualty, 2009. So which one is closest? I'm not sure that I can answer that, Your Honor. I can tell you that the ones that apply to this situation are very clear what should happen. Endorsement 11 takes paragraph D out of Section 3 of the original policy, deletes it, and replaces it. Endorsement 13 takes, again, from Section 3, exclusions A, B, C, and D, delete them, and replace them. So what happens is both of those, delete D, both of them replace with language, and if you look at the two of them, one of them includes language that would bar contractual exclusion-type claims. The other one is silent on the issue. They are in direct conflict, and they create an ambiguity. When that ambiguity is created, by the insurance company, through the words that they chose that mean exactly what they say. When they created that, they created a situation where a choice has to be made. The choice that the district court took was a choice to deny or decline coverage. That's the choice that's not mandated by Missouri law. The choice that's mandated when there's an ambiguity is you must find in favor of coverage. Now, it would have been very easy. It would have been very easy for Allied to write this contract so that this ambiguity did not exist. Given, though, that these endorsements, my understanding is they happen at the same time, even though they're numbered differently. Why isn't the only reasonable reading given a different canon, the canon of harmonizing all the provisions in the contract? Why shouldn't we read endorsement 13 and endorsement 11 together, replacing the original D in the original insurance agreement? Judge Strass, a pleasure to meet you, sir. And the answer to your question is because that's not harmonizing it, we have to use the words that they wrote into the policy. In order to read them together, we have to do one of two things. We either have to delete words that are in the policy and ignore them. Namely, in endorsement 13, we have to ignore where it says exclusions A, B, C, and D are deleted. We have to ignore where it says and D are deleted. And in fact, the point I was preparing to make just a moment ago is had they done that, had they changed it so it said instead of A, B, C, and D, are deleted and replaced in their entirety, had they done that, the ambiguity would not be there. But they didn't do that. So we can't harmonize them. We would have to ignore those words. Or the other alternative, Judge Strass, would be to insert language in endorsement 13 that does not exist in there. Had Allied written that section 3, exclusions A, B, C, and D are deleted in their entirety and replaced with the following, and then had they included except as set forth in endorsement 11, had they said that, that would resolve this ambiguity. They did not say that. So you can't harmonize them. They wrote the ambiguity into it. And to ignore that ambiguity would be a violation. It would be a failure to follow the contractual construction law that also is bust up. The court doesn't have to do violence to contractual construction or to the well-settled law of insurance contracts. And for that matter, the court doesn't have to do a thing to the case that the defense points to quite extensively, the Spiritas case issued by the Eighth Circuit. And the reason why is this is not a case like Spiritas. Spiritas does not apply here. Spiritas is not an ambiguity case. This, in its first instance, is an ambiguity case. Spiritas is a case that was decided on summary judgment, not thrown out of court on a motion to dismiss. And importantly in Spiritas, which leads to the next point, the Spiritas case, the underlying case, did not include allegations of fraud. It did not include allegations of a breach of fiduciary duty, like were alleged in the underlying Iowa case here. Now, whenever there are extra contractual claims, as there were in the underlying Iowa case here, that even if Section 3D as set forth in Endorsement 11 was part of the contract, which we believe the mandated choice under Missouri law is to disregard that in favor of the coverage afforded under 13, but even if it was in there, the possibility of liability under an extra contractual claim, whether it's fraud, breach of fiduciary duty or otherwise, the possibility of liability under one of those is enough to trigger the duty to defend and likely indemnify in the result of an adverse judgment. Here, not only is there an ambiguity, but there is clear covered claims pled in the underlying Iowa case. Either one of those points gets us to where we would like to be, which is remanded to the district court for further proceedings and ultimately the ability to help Virto and Seth Burgett make a recovery under the policy that they paid for, where they paid the premiums on time, where they have a covered claim, and it has been denied and denied and denied while they continue to defend a case that has been tried, appealed and remanded for additional trial proceedings as we speak today. A years-long saga that should have been covered in the first instance. Epstein, any other questions at this time? Your honors, I'd like to reserve my rebuttal and speak with you again in a few minutes. Hearing no other questions, you may reserve it. Thank you, Mr. Cole. Thank you. Ms. Higgins. May it please the court. I'm Angela Higgins. I'm here representing Allied World Specialty Insurance Company, which I'll call Allied World. Endorsement 11 does just one thing. All it does is supply a modified exclusion fee. Endorsement 13 is seven pages long. It does a lot of things. It tailors this policy to a privately held company versus a publicly held company. One of the things that needs to guide this court because Missouri law controls is the Martin versus U.S. Fidelity case, which held that even where an endorsement could have been more clear, its inclusion in the policy demands that its terms be included in the contract. We cannot simply ignore Exclusion 11. And Martin addresses this argument that there's some ambiguity. Martin recognizes that the way that policies are constructed to tailor them to individual risks, individual insurance, is a bit of a Frankenstein operation. It's a bit of a blunt instrument where we take the form and we modify it through endorsements. But Martin recognizes that a policy is by necessity assembled in such a way. There is no conflict between, there are no two, there aren't two Ds. D, Exclusion 11 supplies Exclusion D. And Exclusion, Endorsement 13 does not supply a conflicting Exclusion D. So there's not an ambiguity in the sense that there are two sets of language to interpret. We've got to read these policy provisions together. And the law is extremely clear. This court, in the Leonard case cited in the briefs, says we can't render any of the policy's provisions meaningless. And that is the consistent law in Missouri, in Martin, in Haggard-Halling, in other cases that are cited in the briefing, that it is a necessity to give force and effect to all provisions in the policy, because these endorsements were all issued at the same time. They were all intended to modify the policy. They were all a bargain for part of the policy. And there's nothing ambiguous merely because the insurer and the insured interpret things differently under the Haggard-Halling case. Counsel, you know, I got to go ahead. Let me interrupt you. Oh, I'm sorry. No, please go ahead. Mine is pretty straightforward. You heard what I said to Mr. Cole, that there are all kinds of insurance cases. Go back forever. Right. What is the closest Missouri case? So I think there are—I don't know if I can cheat here and say that there are three. I would say Haggard-Halling is a Missouri Western District case. This is every clause in an insurance policy must be given some meaning if it's reasonably possible to do so. Seeming contradictions must be harmonized away if it is reasonably possible to do that. Conflicting provisions even must be reasoned away. This court's decision in Noonan from 2019 is this chicken-and-egg problem, is this order of endorsements, and does it matter? And Noonan found that it does not matter. And looking at this policy, there's nothing in the policy, the main policy form, or any of the endorsements that says any endorsement takes priority over any other. And, in fact, the way the policy is constructed, the schedule of endorsements, the list of what endorsements are attached, isn't found until endorsement number seven. It does not appear that there is any rhyme or reason to how these endorsements are numbered. And what Noonan says is this idea that these things are in conflict and we've got to decide which goes first is a red herring. It is a false dichotomy. If we can apply them both, we're obligated to apply them both. Now, Noonan is applying Minnesota law, but Missouri has the same rule of interpretation. And in Martin, the Missouri Supreme Court endorsed Minnesota's own law of insurance interpretation. So Noonan is right on point. Martin is right on point. Even where we acknowledge that the attempt to cobble together an individually tailored policy endorsement isn't always pretty, it is a necessity. That's how policies are assembled. It is possible to write your own custom-tailored policy. Those are expensive, and those are the kind of things that very, very large companies do. Council, let me ask you about this. I just want to, you know, I'm a simple guy. I'm just reading the terms of the insurance agreement. You have D in the original insurance agreement, and then you have endorsement 11 that deletes exclusion D and replaces it with a new exclusion D. Now, it didn't have to include the D there, but it included the D there. So now you have old D and you have new D. And then you have another subsequent exclusion that says basically A, B, C, and D are deleted in their entirety and replaced with the following. Now, I read that as a later exclusion and say what D? Old D, new D, or both Ds? And I don't know the answer to that, and I'm hoping you can help me because I just think it's really unclear. I know what the insurer meant to say, and I know what it's trying to accomplish, but that's not the same thing as saying it. Certainly. Well, and I think that Noonan and Martin give us the answer, which is that endorsements each modify the form policy. They don't modify each other. So endorsement 11 modifies the form. Endorsement 13 modifies the form. Endorsement 11 deletes D and replaces it. And for what it's worth, it actually replaces it with an exclusion that's more favorable to the insurer. It includes the securities carve out. So there's an area that's now accepted from exclusion under endorsement 11. Endorsement 13, anyway, we don't have a record as to why this was decided on a motion to dismiss. How did this happen? It references A through D. It does not replace D. And I think what's important in understanding and then looking at things like the Noonan cases, and Martin recognizes, that's not optimal in a lot of ways, but that's kind of the nature of the beast when you're trying to amend a form policy with endorsements. And the question is, is it possible to read them together? Because the alternative is to ignore endorsement 11 entirely. And that was a bargain for part of the contract. And there's nothing in the contract, there's nothing in endorsement 13 that indicates it intends to nullify endorsement 11. It's ambiguous and, you know, it was decided on a motion to dismiss, and I know you disagree with that. What's the proper procedure? Would it be to send it back down to reverse the dismissal and send it back down? Or in the insurance company's view, is there something else we'd be missing or should be looking at? So, I mean, we believe this was properly decided on a motion to dismiss. And, frankly, there are other coverage issues that would involve FACTS. So it's not like this is a case-determinative outcome. Regardless, we'll still litigate, there will still be summary judgment. There's still the issue, and I think this is a substantial issue that gets a little bit into the spur-toss issue, of the underlying Iowa suit is not against the named insurer of the company. It's against Seth Burgett individually with respect to these reallocation agreements, which are these side agreements that he did with the plaintiffs. And so the question is, you know, Seth Burgett's only insured if he's acting on behalf of the company. Well, his individual side agreements with the plaintiffs aren't in that capacity. So there are other issues here. And, you know, with respect to opposing counsel, this is not a willful or improper refusal to have defended or covered. But this issue is just the one that was most susceptible to determination as a matter of law by the court. But the fact is that the court does require enforcement of, you know, giving enforcement of FACTS to all language if it is possible. One thing I do want to address on this second point of the spur-toss case is that, although there were not allegations of fraud or breach of fiduciary duty, in spur-toss, there were tort allegations of conversion and there was an acquittal claim for trust, which are analogous. And this court in spur-toss found that because the underlying relationship gives rise to all of the claims, is a contractual relationship. And that is admitted by Mr. Burgett in his declaratory judgment action that he filed. That is alleged throughout the petition by the underlying plaintiffs that their relationship arises out of these reallocation agreements, these side contracts that Burgett had with them individually, to pay them out of money that he personally received out of the Harmon-Carton acquisition. So all of the claims, and spur-toss does address tort and equitable claims as well as contract claims, are all barred properly and properly not defended and properly not identified by virtue of a contract exclusion. Let me ask a question, and I may be wrong about this, but aren't some of the underlying plaintiffs not even parties to the contracts, the reallocation agreements? My understanding is the allegations in the petition are that they all are seeking recovery pursuant to reallocation agreements. Wouldn't the breach of contract claim, excuse me, the breach of fiduciary duty claim, exist even if there weren't any reallocation agreements? In other words, you had a duty to share fairly with us independent of the contract. So don't we really have an independent claim here? Well, the breach of fiduciary claim, the count in the petition incorporates by reference all the factual allegations, which are that our claims derive from the reallocation agreements. And the arguments about fiduciary duty are fiduciary duty to explain, consider the reallocation agreements. I mean, it is, and it's not a claim against the LLC, against the company or other members of the company. It's against Dr. Jett individually on the basis of his entering into these reallocation agreements with the plaintiffs. But it's a D&O policy, isn't it? It is. Yeah, so it doesn't necessarily have to be against the company, right? Director and officer. But there's no other, there are no other members of the organization who are identified as defendants. There is no allegation the company itself erred. These are all, I mean, the factual allegations are that Seth Burgett entered into these reallocation agreements. Burgett himself in his declaratory judgment complaint said that the nature of his dispute with these claimants was, this was a defensive attempt to get a declaratory judgment action decided before the IO case was decided, but that the nature of that dispute was contractual in nature, and that it was about the duties and rights and obligations under the reallocation agreements. So if there are no other questions, I'll go ahead and rest. Very well, hearing none. Thank you, Ms. Higgins. Mr. Cole, I believe you have some rebuttal time. Thank you, Judge Grunder. First, I would just note that Seth Burgett is an additional insured, and that's not in dispute here. Judge Grunder, in response to your question about fiduciary duty, absolutely, absolutely. That claim is independent of any contractual relationship entered into under these reallocation agreements or otherwise. In answer to your question on the reallocation agreements, the record before you is a little bit fuzzy on that. It is my understanding and representation to both the court below and to your honors that not all investors were subject to the reallocation agreements or executed them, but quite frankly, that's fuzzy on the record before you. What about, counsel, if you look at the Court of Appeals Iowa decision of June 3rd? Does that clarify that question? Well, and they make a statement there, your honor, that is what it is, and I do not believe that that is correct, but I can't point to a place that's in the record to tell you that, and so it says what it says, but it's not dispositive even if it were correct because getting back to what Judge Strass said, and Judge, I'll be close, you said, I don't know what the answer is to why they did it, how they did it. I know what they meant to do, but that's not what it says, and that's where we are here. We're at a situation where the words that they wrote created an ambiguity. Now, if we disregard the endorsement 11 language as we should, we are not saying, gosh, throw this away, we're just going to disregard something that makes sense. We're making the choice that is mandated by Missouri law. That's an ambiguity. That's an ambiguity, and another thing, Judge Strass, that you were spot on about with your question is in 11, when they deleted D in its entirety and replaced it as follows, they didn't have to put the letter D in front of that. They could have put little i. They could have put no number before it. They just put words and characters there. The same thing happened in endorsement 13. They deleted unquestionably A through D, and they replaced A through D unquestionably with characters and verbiage, and the fact that they said A, B, and C before some of the paragraphs is without import here because what they said in each of those is in direct conflict with each other, and the conflict is so harmful to the insurance here because one way of reading it declines them coverage in contractual exclusion type situations, and the other does not. Mr. Coe, before your time's gone, I heard the other side say they think Martin's a very close case.  Okay, even where Martin says when an exclusion could have even been more clear, we still have to try to read it. Martin does not say when the exclusion is diametrically opposed, 180 degrees opposite in result to another endorsement, we should still read it anyway. It doesn't say that, and that's the situation that we have here. So Martin does not apply. We can't give meaning to both of these. We can't because the way they wrote it, and when we can't give meaning to both, the law is clear. We have to read it in favor of coverage. Counsel, let me – I hate to interrupt you, but there are two things that are still bothering me about this case. One is the timing, which you already discussed. These were both done at the same time, so there's at least more of a presumption there that they're meant to complement each other than supersede each other. The other is there's a case called Grable v. Atlantic, which is a Missouri court of appeals case, but it reflects what opposing counsel said, which is that the endorsements are designed to amend the foreign policy, and they're not really designed to amend each other. Could you address that latter point because that's not one we've covered yet? That doesn't change my position at all, Your Honor, because if 11 amends the policy and becomes a part of the policy and then 13 amends the policy and becomes a part of the policy, now they're both part of the policy. We read one, we read the other. We can't reconcile them. We have to make that choice, and the choice that the district court took was the choice to deny coverage when we're reading both of those, and the choice that I'm urging you to take is to read the one that provides coverage in accordance with longstanding Missouri law and send us back on remand. As far as what I'm asking this court to do, I'm asking this court to find, as a matter of law, that there is an ambiguity, and let's answer that question for the district court. Send us back there, and I'll agree with Ms. Higgins. There may be other issues that we need to litigate and present to the trial court, but the ambiguity is clear, and if not the ambiguity that the two claims at a minimum, breach of fiduciary duty and fraud, would be covered claims. That ends my time, Your Honors. Mr. Call, I have a question for you, though. With respect to the breach of fiduciary duty claim, Ms. Higgins says that the reallocation agreement allegations are incorporated into that claim. So tell me how that's played in a way that is independent of the reallocation agreements. I saw Your Honor kind of nodding when that discussion was going on, Judge Grunder, and you know from your practice and experience that the fact that people incorporate other counts and other allegations is really a routine practice, and it's not necessarily a dispositive practice, but if we look at the order in which these claims were pled in the Iowa case, claim one is fraud. It incorporates the common allegations above it. Breach of contract comes two counts later. Fraud is not incorporating breach of contract. Claim two, breach of fiduciary duty, that comes before the contract claim and is incorporating, yes, some of the same common facts above, such as that it's alleged Seth Burgett unilaterally terminated two directors in breach of his fiduciary duty. That's incorporated in there. Only when we get to the third count, breach of contract, do we have the breach of contract claim. I typically plead my strongest claims first, and I think a lot of people do, and here they pled fraud first, and it stands alone just like the breach of fiduciary duty does. They're covered claims. All right. Very well. Thank you, Judge Grunder, Judge Benton, Judge Strauss. Thank you, counsel. We appreciate your appearance and arguments today. Case is submitted and will be decided in due course.